## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

_____X
ELI LILLY AND COMPANY, by NATIONAL UNION
FIRE INSURANCE COMPANY OF PITTSBURGH,
PENNSYLVANIA, as subrogee.


            Plaintiffs,

      -against-

TYCO INTEGRATED SECURITY, LLC., F/K/A
ADT SECURITY SERVICES, INC., A SUBSIDIARY
OF TYCO INTERNATIONAL LTD, CO.,
           Defendants.
_____X

CIVIL NO.

## COMPLAINT

## COMPLAINT

Plaintiffs NATIONAL UNION FIRE INSURANCE COMPANY OF
PITTSBURGH, PENNSYLVANIA, as subrogee of ELI LILLY AND COMPANY,
(hereinafter "National Union") (hereinafter referred to as "Plaintiff") by and through its
attorneys Tisdale Law Offices, LLC and The Gilbert Firm, as and for its Complaint
against Defendant TYCO INTEGRATED SECURITY, LLC., F/K/A ADT SECURITY
SERVICES, INC., A SUBSIDIARY OF TYCO INTERNATIONAL LTD, CO.,
(hereinafter "ADT"), alleges upon information and belief as follows:

## NATURE OF THE ACTION

1.     This is an action for damages resulting from the theft of drugs from a
distribution warehouse operated by Eli Lilly Pharmaceuticals located in Enfield,
Connecticut.

2.      It is alleged that Plaintiff's damages were the result of actions and inactions by Defendant ADT that caused or contributed to the vulnerability of Eli Lilly's facilities.

## PARTIES

3.      Eli Lilly is an Indiana Corporation, with its principal place of business in Indianapolis, Indiana.

4.      Plaintiff, National Union is a Pennsylvania Insurance Corporation, with its principal place of business in New York.  National Union provided an insurance policy to Eli Lilly and Company that provided certain coverage for the incident and resulting damages that are the subject of this action.  National Union may have a right, title or claim to an award of damages in this case by virtue of a claim of subrogation.

5.      Defendant, TYCO INTEGRATED SECURITY, LLC., is Delaware Corporation with its principal place of business in Wilmington, Delaware.

6.      Defendant ADT was a Delaware corporation with its principal place of business in Boca Raton, Florida.

7.      Defendant, TYCO INTERNATIONAL SERVICES, LLC., is Massachusetts Corporation with its principal place of business in Wilmington, Delaware.

## JURISDICTION

8.      This Court has jurisdiction pursuant to Title 28 U.S.C. § 1332 over actions between corporations of diverse citizenship with damages exceeding $75,000 exclusive of interest and costs.

9.      This controversy arises from the theft of Eli Lilly's pharmaceuticals from a distribution warehouse secured by Defendant ADT located in Enfield, Connecticut.

## VENUE

10.     This matter arises out of a theft that occurred at a premises in Enfield, Connecticut secured by Defendant and as such, a substantial part of the events or omissions that give rise to the claim occurred within this judicial district.

11.     Venue is proper in District of Connecticut under 28 U.S.C. § 1391(a)(2).

## FACTS

12.     Defendant ADT initially contracted in 1974 to provide security equipment and monitoring services to Eli Lilly for its Enfield Connecticut distribution warehouse. These services were uninterrupted and repeatedly augmented and supplemented over the years up to and beyond the time of the incident that is the subject of this litigation.

13.     On September 8, 2004, ADT relied upon its long-standing relationship of confidence and fidelity with Eli Lilly to gain access to the Enfield, Connecticut location and conduct a security review of the adequacy of the security services in place. On November 12, 2004 ADT generated a confidential written proposal for upgraded security equipment and service to Plaintiff's facility. ("2004 Confidential Proposal".)

14.     The 2004 Confidential Proposal contained a narrative description of proposed intrusion detection equipment and inventoried the equipment existing on site. The 2004 Confidential Proposal also included a narrative description of proposed additional camera surveillance equipment; proposed additional access control equipment and proposed new intercom system equipment.

15.     The 2004 Confidential Proposal did not contain illustrations or maps or any more specific illustrative description of protections in place at the facility.  Nor did this proposal detail or highlight areas of the facility that were insufficiently secured.

16.    ADT's 2004 Confidential Proposal was a 15 page document that contained work and price proposals for the installation of additional equipment; access control system equipment; intercom system equipment with built in cameras; camera surveillance system equipment with video recorders; system maintenance and inspection services.

17.    The 2004 Confidential proposal described the proposed Enfield, Connecticut services as "improvements" without highlighting any arguable weaknesses in the existing systems.

18.    The 2004 Confidential  Proposal was a "confidential proposal for camera surveillance with digital recording monitored security and access control systems"; was submitted by ADT to Eli Lilly as "strictly confidential" and "intended solely" for Eli Lilly to evaluate ADT services as a vendor. In preparing the 2004 Confidential Proposal, ADT created the reasonable expectation that adequate care would be taken by ADT to secure the content of the proposal.

19.    In 2004 ADT and Eli Lilly entered into a five-year contract for the proposed enumerated security services in the 2004 Confidential Proposal for the Enfield Connecticut location that was renewable annually after 2009. ("2004 ADT Contract").

20.    The 2004 ADT  Contract provided the following security monitoring and maintenance services: Biannual inspections of all installed security devices, with an associated report; an annual inspection of access control components, with an associated report; an annual inspection of all camera surveillance equipment with an associated report, monitoring services and system maintenance checks.

21.    In July 2009, ADT again relied upon its longstanding business relationship of confidence and fidelity with Eli Lilly to gain access to the Enfield, Connecticut

location and conduct a security review of the adequacy of the services provided under the 2004 ADT Contract. Thereafter, on February 19, 2010, ADT generated another confidential system proposal for enhancements and upgrades to the security services in effect. (Hereinafter referred to as "2010 ADT Confidential System Proposal".)

22.     The 2010 ADT Confidential System Proposal was a confidential document intended solely to permit Eli Lilly to evaluate services proposed by ADT as its vendor.

23.     ADT utilized its preexisting relationship with Eli Lilly to access and evaluate sensitive confidential security information; identify security vulnerabilities at Eli Lilly Enfield, Connecticut facility and generate a business proposal for ADT to sell additional equipment and services to Plaintiff.

24.     The 2010 ADT Confidential System Proposal contained a narrative of the existing Camera Surveillance System as well as of the proposed additions.

25.     In contrast to the 2004 Confidential Proposal, the 2010 ADT Confidential System Proposal also contains a section entitled "Adjustment and/or relocation of existing analog cameras." This section explicitly identifies the location of each of thirteen enumerated and labeled cameras and highlights specific faults and blind spots in the video images captured by each camera, including particular identifications of numbered doors and outside bays invisible to the video surveillance system.

26.     The 2010 ADT Confidential System Proposal contains an architectural drawing of the existing layout of the interior of the Eli Lilly warehouse with a graphic overlay labeling the "x" and "y" coordinates of the interior contents of the entire distribution center.

27.     The 2010 ADT Confidential System Proposal identifies the actual coordinates of every motion detector, beam, roof hatch, intercom, overhead door contact, fixed camera, panic button, card recorder, glass break sensor, contact, control panel and keypad.  The identified cameras and their directional views as well as the items within their view are indicated on the architectural diagram also annexed.

28.     The 2010 ADT Confidential System Proposal contains a separate diagram of the warehouse with an overlay of "proposed additional warehouse cameras" and highlights the view to be monitored by the new cameras.

29.     The 2010 ADT Confidential System Proposal contains an aerial image of the facility including the location of 15 exterior cameras proposed to "create a virtual fence" of the perimeter of the distribution center.

30.     The 2010 ADT Confidential System Proposal also contains a detailed narrative of the existing II. Intrusion System, in which the location of proposed motion sensors are identified by mapped coordinates of the annexed layout and an explanation of the range of the warehouse that will now be under surveillance with the proposed motion detectors.

31.     The 2010 ADT Confidential System Proposal highlights the absence of sufficient monitoring of the master control equipment and recommends the addition of a motion detector at the back of the MCC [Master Control Center] facing the entrance door to the "MCC" room.  (This explanation and proposal is accompanied by the identified location of the camera at coordinates "(0,10)" on the annexed engineering drawing.)

32.     The February 18, 2010 ADT confidential system Proposal "expired" within 90 days of its writing (or in May 2010).

33.     On the night of March 13-14, 2010, less than a month after the date on the 2010 ADT Confidential System Proposal, pharmaceuticals valued in excess of $60,000,000 were stolen from the Eli Lilly distribution center located at 150 Freshwater Blvd., Enfield, Connecticut (herein after "the Enfield Location").

34.     On the date of the burglary, a tractor-trailer was parked in the only loading bay out of seven that was outside the view of the existing surveillance cameras installed as part of the ADT 2004 Security Contract.

35.     The burglars gained access to the roof of the warehouse and crossed the entire length of the roof of the distribution center to arrive at a small area precisely located above the master control room, which had been identified in the 2010 ADT Confidential System Proposal as inadequately monitored and requiring two additional warehouse cameras.

36.     The area of the roof utilized to access the warehouse comprised less than 1% of the total surface area of the roof of the facility and was the only safe point of entry in which burglars could avoid the security system equipment in place.

37.     The burglars cut a 2 foot x 2 foot hole in the roof of the Eli Lilly distribution warehouse and rappelled to the precise location in the warehouse that was identified in the 2010 ADT Confidential System Proposal as being invisible to detectors and surveillance cameras in place under the existing ADT 2004 Contract services, and thereby gained access to and disabled the master controls for the ADT 2004 Contracted Security System.

38.     The burglars disabled the control panels for the equipment provided under the ADT 2004 Contract and the monitoring services provided under the ADT 2004

Contract were not alerted.  The communication system was disabled by merely disconnecting the system from its communication devices and destroying the cell phone lines that provided system redundancy. Once the communications were disconnected, the security mechanisms could not convey alerts to the ADT monitoring station.

39.    The 2004 ADT Contracted equipment and monitoring services did not fail, but rather were actively bypassed by parties with detailed technical knowledge of the system.

40.    Upon information and belief, ADT initiated an internal effort to centralize storage of the sensitive confidential information gathered during its marketing and installation of its clients' and proposed clients' security systems to an information storage mechanism in Florida.

41.    In connection with a series of burglaries, on May 3, 2012, the Federal Bureau of Investigations indicted several individuals from the Florida area.

42.    In specific connection with the Enfield, Connecticut burglary, individuals named Amaury and Amed Villa of Florida have been indicted and are pending conviction and sentencing in Federal facilities in the State of Connecticut.

43.    Amaury and Amed Villa utilized unique and confidential knowledge of the security system and the components of that system in existence at Eli Lilly's Enfield, Connecticut Distribution Center to effectively infiltrate the warehouse without triggering the security monitoring system.

44.    The information utilized by defendants Amaury and Amed Villa regarding the location and type of each alarm system component within the Enfield, Connecticut Distribution Center and the inadequacies of the security system provided by the 2004

ADT contractual services during the 2009 audit of the system was unavailable to the general public.

45.     The confidential information regarding the inadequacies of the existing ADT system that were identified by ADT in the 2010 Confidential System Proposal were utilized to evade the equipment and monitoring services contracted for by and between ADT and Eli Lilly.

## PATTERN AND PRACTICE OF WAREHOUSE BURGLARIES "PROTECTED" BY ADT

### Orlando, Florida

46.     In July 2008, the Quality One Wireless warehouse in Orlando, Florida was burgled or illegally entered via access through an adjacent warehouse.  The assailants knew where to cut a hole between adjoining walls to gain entry into Quality One to steal cell phones and wireless equipment without triggering the alarm system.  The facility was secured by ADT with alarms, sensors and video surveillance throughout the warehouse building.  No alarm wires were cut and the ADT alarm system for the warehouse and inner offices were working properly.

47.     In this burglary, once again, information regarding the layout of the warehouse and unique, confidential information about the location and types of security equipment on site was effectively utilized to bypass the existing ADT security systems.

48.     Despite ADT's knowledge that this and other burglaries had taken place utilizing information only available to individuals with access to sensitive information about the ADT security system, ADT did not notify Eli Lilly of the burglary or of the increased foreseeable harm created by detailed documentation of its security systems for the purpose of marketing potential improvements to the existing service.

49.     Upon information and belief, this burglary was orchestrated by individuals originating from the Florida area who utilized information of a nature that ADT in Florida would have compiled in the ordinary course of its business evaluating its clients' and prospective clients' security systems.

**Grand Prairie, Texas**

50.     In December 2009, Amaury Villa was arrested for breaking and entering the AM-C Warehouses in Grand Prairie, Texas.

51.     The security services provided to AM-C Warehouses contracted from ADT or its affiliated entity at the time in 1987 provided motion detectors, infrared beams and contact sensors in specific locations within the warehouse facility.

52.     In or about March 2009, ADT utilized its confidential business relationship to conduct a security review and evaluation of the equipment and system at the AM-C warehouse to prepare a proposal for upgraded services.

53.     ADT utilized confidential information obtained by virtue of its relationship with its customer to identify the inadequacies of the services in place to create a document/proposal that included a detailed map of AM-C's facility that identified the existing monitoring devices and the inventory within the warehouse.

54.     The written evaluation identified that the office facilities within the warehouse were inadequately monitored by the ADT services in place and that the halls and corridors were all that was within the view of the ADT intrusion detection equipment on site.

55.     The written evaluation also identified that the inventory of stored merchandise within the warehouse was cigarettes and indicated where the inventory was located.

56.     Despite what was otherwise identified as an elaborate security system in place at the AM-C Warehouse, the defendant burglars avoided the security system by rappelling from the roof of the warehouse into the office spaces outside the scope of detection devices, and then avoiding the monitored corridors and hallways by tunneling through the unmonitored office walls.

57.     The burglary at the AM-C warehouse did not target removal of any property within the office spaces; rather, the offices were utilized to avoid the monitored corridors to gain access to the warehouse area that was identified on the ADT documentation as storing cigarettes.

58.     The burglary at the AM-C Warehouses in Grand Prairie, Texas was accomplished without triggering the security monitoring equipment or implicating the services contracted with ADT.

59.     The contracted ADT equipment and monitoring services did not fail, but rather were actively bypassed by parties with detailed technical knowledge of the system.

60.     Despite ADT's knowledge that this and other burglaries had taken place utilizing information only available to individuals with access to sensitive information about the ADT security system review by ADT, ADT did not notify Eli Lilly of the burglary or of the increased foreseeable harm created by detailed documentation of its security systems for the purpose of marketing potential improvements to the existing service.

11

61.     This burglary was orchestrated by individuals originating from the Florida area who utilized information of a nature that ADT in Florida would have compiled in the ordinary course of its business evaluating its clients' and prospective clients' security systems.

**East Peoria, Illinois**

62.     Defendant Amed Villa has also been charged in connection with the January 2010 burglary of 3,500 cases of cigarettes valued at more than $8 million previously stored at the Federal Warehouse in East Peoria, Illinois.

63.     In January 2010, ADT Security provided contracted security services to Federal Warehouse in East Peoria, Illinois at the time of its burglary.

64.     In this burglary, once again, information regarding the layout of the warehouse and unique, confidential information about the location and types of security equipment on site was effectively utilized to bypass the existing ADT security systems.

65.     Despite ADT's knowledge that this and other burglaries had taken place utilizing information only available to individuals with access to sensitive information about the ADT security system, ADT did not notify Eli Lilly of the burglary or of the increased foreseeable harm created by detailed documentation of its security systems for the purpose of marketing potential improvements to the existing service.Upon information and belief, this burglary was orchestrated by individuals originating from the Florida area who utilized information of a nature that ADT in Florida would have compiled in the ordinary course of its business evaluating its clients' and prospective clients' security systems.

## **<u>Duties Owed by ADT</u>**

66.     Defendant ADT had a fiduciary duty of fidelity to protect the information it received/developed in the course of its business relationship with Plaintiff.

67.     Defendant ADT had a duty as an agent of Plaintiff to protect the information it received/developed in its business relationship with Plaintiff to secure Plaintiff's facility.

68.     Harm to Plaintiff was foreseeable where Defendant failed to safeguard the information it possessed and created regarding the details of Plaintiff's security system.

69.     Defendant ADT knew or reasonably should have known that multiple burglaries had taken place at facilities in which ADT had been engaged to provide security services and/or evaluate the security services in existence.

70.     Defendant ADT had a duty to act upon the knowledge that multiple burglaries of facilities in which it provided security services, had taken place utilizing confidential information about the details of the security systems in existence.

71.     Defendant ADT had a duty to safeguard and secure the confidential information it compiled and created associated with the security systems it installed and evaluated.

72.     Defendant ADT had a duty to reveal to Plaintiffs any known or perceived vulnerability created by the existence of its relationship and the records or documentation generated during the security services it provided, including the facts of other such burglaries.

73.     Defendant ADT had a duty to correct and to warn Plaintiff of the known and foreseeable harm to Plaintiff that could come from the existence of records or

documentation generated during the security evaluation process and by virtue of Defendant's potential failure to, or inability to, adequately safeguard the information gathered in the course of providing its security services.

74.     Defendant ADT had a duty to warn Plaintiff that ADT secured facilities had been repeatedly compromised utilizing sensitive, privileged information about the systems provided by defendant.

### Breach

75.     By Virtue of Defendant ADT's negligence, gross negligence, and/or intentional, reckless, willful, wanton, careless actions or inactions, Plaintiff Eli Lilly was caused to sustain injury to its business and loss of its property.

### ADT's NEGLIGENCE

76.     By virtue of Defendant ADT's negligence, gross negligent and/or wanton, reckless, willful disregard for the security of its clients and prospective clients, ADT permitted confidential, sensitive information regarding the essential details of the components of the existing security system and equipment of its clients and prospective clients' facilities to become available to third persons.

77.     By virtue of the aforementioned negligence, gross negligence and/or wanton, reckless or willful disregard of the confidential sensitive information entrusted to ADT in the course of its business dealings with clients and prospective clients, Defendant ADT caused said confidential information to be compiled in a manner that would foreseeably lead Plaintiff to become vulnerable to third persons and to suffer harm.

78.     By virtue of the negligence, gross negligence and/or intentional reckless or willful disregard for its clients and prospective clients' security, ADT its agents,

subcontractors, servants, and/or employees, defendant failed to safeguard the confidential, sensitive information gleaned by virtue of its fiduciary/ agency relationship to Plaintiff and in so doing foreseeably caused Plaintiff to suffer harm.

79.     By virtue of ADT's negligence, gross negligence and/or intentional reckless or willful disregard for its clients and prospective clients' security, ADT, its agents, subcontractors, servants, and/or employees failed to disclose and or warn Plaintiff of the increased foreseeable harm created by documenting its security systems.

80.      By virtue of ADT's negligence, gross negligence and/or intentional reckless or willful disregard for its clients and prospective clients' security, ADT, its agents, subcontractors, servants, and/or employees failed to disclose and warn Plaintiff of multiple burglaries that had taken place utilizing information only available to individuals with access to sensitive, confidential information about the security systems to which ADT had privileged access across the country.

## COUNT I

### (Failure to Safeguard Confidential Information)

81.     Plaintiffs repeat and reiterate each and every allegation set forth in paragraphs 1 through 80 of the Complaint as if fully alleged herein.

82.     As a direct and proximate result of Defendant's negligence, gross negligence, and/or intentional, reckless, willful, wanton, actions and/or omissions of Defendant ADT, its agents, subcontractors, servants, and/or employees, Defendant compiled a complete and thorough report of Plaintiff's existing security system providing in a single document a comprehensive guide to Plaintiff's security coverage.

83.     As a direct and proximate result of Defendant's negligence, gross negligence, and/or intentional, reckless, willful, wanton, actions and/or omissions of Defendant ADT, its agents, subcontractors, servants, and/or employees, Defendant compiled a complete and thorough report of Plaintiff's existing security system and then utilized that confidential information to produce, in a single document, a comprehensive guide to every security vulnerability and flaw inherent in that system.

84.     As a direct and proximate result of the negligence, gross negligence, and/or intentional, reckless, willful, wanton, actions and/or omissions of Defendant ADT, its agents, subcontractors, servants, and/or employees, defendant failed to safeguard privileged, confidential, detailed, technically precise information regarding the vulnerabilities of Plaintiff's security system.

85.     By virtue of aforesaid negligence, gross negligence, and/or intentional, reckless, willful, wanton, actions and/or omissions of Defendant ADT, its agents, subcontractors, servants, and/or employees, defendant failed to safeguard privileged, confidential, detailed, technically precise information regarding the vulnerabilities in Plaintiff's security system and Plaintiff was foreseeably caused to suffer harm.

86.     Pursuant to National Union's policy of insurance, National Union paid Eli Lilly an amount in excess of $ 42,118,354.00 for the damage to real property, inventory and other expenses associated with the harm suffered.

87.     By virtue of their payments, National Union became legally and equitably subrogated to the rights of recovery of Eli Lilly to the extent of its payment.

**WHEREFORE,** Plaintiff Nation Union, demands judgment against Defendant ADT for an amount in excess of $ 42,118,354.00 together with the costs of this action, and such other relief as deemed just and proper under the law.

## COUNT II

### (Failure to Warn)

88.    Plaintiffs repeat and reiterate each and every allegation set forth in paragraphs 1 through 87 of the Complaint as if fully alleged herein.

89.    As a direct and proximate result of the negligence, gross negligence, and/or intentional, reckless, willful, wanton, actions and/or omissions of Defendant ADT, its agents, subcontractors, servants, and/or employees, defendant failed to warn Plaintiffs about known and foreseeable risks inherit in compiling the confidential security information about Plaintiff's security.

90.    As a direct and proximate result of the negligence, gross negligence, and/or intentional, reckless, willful, wanton, actions and/or omissions of Defendant ADT, its agents, subcontractors, servants, and/or employees, defendant failed to warn and or inform Plaintiffs of the recent increased loss experienced as a result of exploited confidential information about the potential vulnerabilities of clients' and potential clients' existing security infrastructure.

91.    By virtue of aforesaid negligence, gross negligence, and/or intentional, reckless, willful, wanton, actions and/or omissions of Defendant ADT, its agents, subcontractors, servants, and/or employees, defendant failed to warn Plaintiff of the known hazards presented by permitting Defendant to document Plaintiff's security system and as a result Plaintiff was foreseeably caused to suffer harm.

92.     Pursuant to National Union's policy of insurance, National Union paid Eli Lilly an amount in excess of $ 42,118,354.00 for the damage to real property, inventory and other expenses associated with the harm suffered.

93.     By virtue of their payments, National Union became legally and equitably subrogated to the rights of recovery of Eli Lilly to the extent of its payment.

**WHEREFORE,** Plaintiff Nation Union, demands judgment against Defendant ADT for an amount in excess of $ 42,118,354.00 together with the costs of this action, and such other relief as deemed just and proper under the law.

## COUNT III

### (Fraudulent Inducement)

94.     Plaintiffs repeat and reiterate each and every allegation set forth in paragraphs 1 through 93 of the Complaint as if fully alleged herein.

95.     As a direct and proximate result of the negligence, gross negligence, and/or intentional, reckless, willful, wanton, actions and/or omissions of Defendant ADT, its agents, subcontractors, servants, and/or employees, defendant fraudulently induced Plaintiff to permit ADT to conduct a review of the existing security infrastructure and propose potential improvements to that security system by explicitly or otherwise representing that, among other things, such conduct would not increase Plaintiff's risk of exposure to property theft.

96.     As a direct and proximate result of the negligence, gross negligence, and/or intentional, reckless, willful, wanton, actions and/or omissions of Defendant ADT, its agents, subcontractors, servants, and/or employees, Plaintiff relied on the representation, implicit or explicit, that in permitting ADT to document the existing

security system for the purpose of creating a Confidential proposal to market potential improvements to be made to its security system, such conduct would not increase Plaintiff's risk of exposure to property theft.

97.    Plaintiff relied on the representation of ADT to its detriment in that by permitting ADT to document Plaintiff's security system, Plaintiff's risk of exposure to property theft was increased and plaintiff was caused to foreseeably suffer damages and loss of property.

98.     Pursuant to National Union's policy of insurance, National Union paid Eli Lilly an amount in excess of $ 42,118,354.00 for the damage to real property, inventory and other expenses associated with the harm suffered.

99.    By virtue of their payments, National Union became legally and equitably subrogated to the rights of recovery of Eli Lilly to the extent of its payment.

**WHEREFORE,** Plaintiff Nation Union, demands judgment against Defendant ADT for an amount in excess of $ 42,118,354.00 together with the costs of this action, and such other relief as deemed just and proper under the law.

## COUNT IV

### (Breach of the Covenant of Good Faith and Fair Dealing)

100.    Plaintiffs repeat and reiterate each and every allegation set forth in paragraphs 1 through 99 of the Complaint as if fully alleged herein.

101.    As a direct and proximate result of the negligence, gross negligence, and/or intentional, reckless, willful, wanton, actions and/or omissions of Defendant ADT, its agents, subcontractors, servants, and/or employees, defendant violated its implied covenant of good faith and fair dealing whereby, in marketing for contracted services,

ADT compiled information regarding existing security services and by virtue of such review created the opportunity for Plaintiff to suffer a breach of its security and foreseeably suffer damage and loss of property.

102.   Pursuant to National Union's policy of insurance, National Union paid Eli Lilly an amount in excess of $ 42,118,354.00 for the damage to real property, inventory and other expenses associated with the harm suffered.

103.   By virtue of their payments, National Union became legally and equitably subrogated to the rights of recovery of Eli Lilly to the extent of its payment.

**WHEREFORE,** Plaintiff Nation Union, demands judgment against Defendant ADT for an amount in excess of $ 42,118,354.00 together with the costs of this action, and such other relief as deemed just and proper under the law.

## COUNT V

### (Injuring the right of the party to receive the benefit of the contract)

104.   Plaintiffs repeat and reiterate each and every allegation set forth in paragraphs 1 through 105 of the Complaint as if fully alleged herein.

105.   As a direct and proximate result of the negligence, gross negligence, and/or intentional, reckless, willful, wanton, actions and/or omissions of Defendant ADT, its agents, subcontractors, servants, and/or employees, defendant's failure to safeguard confidential information regarding Plaintiff's security system defendant ADT injured Plaintiff's right to receive the benefit of its contract with ADT for security services.

106.   By generating a document which consolidated confidential information detailing Plaintiff's security system infrastructure, Defendant created the opportunity for Plaintiff to suffer a breach of its security and foreseeably suffer damage and loss of

property, thus injuring Plaintiff's right to receive the benefit of its contract with ADT for security services.

107.     Pursuant to National Union's policy of insurance, National Union paid Eli Lilly an amount in excess of $ 42,118,354.00 for the damage to real property, inventory and other expenses associated with the harm suffered.

108.     By virtue of their payments, National Union became legally and equitably subrogated to the rights of recovery of Eli Lilly to the extent of its payment.

**WHEREFORE,** Plaintiff Nation Union, demands judgment against Defendant ADT for an amount in excess of $ 42,118,354.00 together with the costs of this action, and such other relief as deemed just and proper under the law.

## COUNT VI

**(Violation of the Connecticut Unfair Trade Practices Act "CUTPA")**

109.     Plaintiffs repeat and reiterate each and every allegation set forth in paragraphs 1 through 110 of the Complaint as if fully alleged herein.

110.     Defendant ADT holds itself out to the general public and to plaintiff in particular as safe, responsible, state-of-the-art, and capable of safeguarding Plaintiff's security system.

111.     Defendant ADTs claims of fidelity and care with regard to safeguarding Plaintiff's security services were untrue and known to be untrue by defendant at the time Plaintiff was caused to rely on them.

112.     Adequate safety standards sufficient to protect details of Plaintiff's existing security system, provided by defendant, constitute the sort of information that a consumer of contracted securities equipment and services would expect to exist of its

security service provider and of the sort that Defendant led Plaintiff to believe existed, but which in fact did not exist.

113.    Had the Defendant in fact met its duty to safeguard confidential information regarding the layout of Plaintiff's existing security system, damage to plaintiff in the form of harm and lost property would not have occurred.  Said damages constitute an ascertainable loss of inventory and real property.

114.    Defendant's false statements and inducements regarding its safety standards occurred in the conduct of trade and/or commerce.

115.    As such, these false statements and inducements constitute an unfair trade practice, as that term is used within the Connecticut Unfair Trade Practices Act, C.G.S. §§ 42-110a through 42-110q. These practices offend public policy, are immoral, unethical, and unscrupulous, and have caused substantial injury to consumers of Defendant's services, including the Plaintiff.

116.    As a direct and proximate result of defendant's breach of its obligations under the Connecticut Unfair Trade Practices Act, Eli Lilly suffered loss and damages in excess of $ 42,118,354.00 for the damage to real property, inventory and other expenses associated with their loss.

## **COUNT VII**

### **(Punitive Damages)**

117.    Plaintiffs repeat and reiterate each and every allegation set forth in paragraphs 1 through 118 of the Complaint as if fully alleged herein.

118.    By virtue of the foregoing Defendant's failure to safeguard Plaintiffs security system information was a result of Defendant ADT's intentional and wanton

violation of Plaintiff's rights and Plaintiff's property, and/or was the result of Defendant

ADT's reckless indifference to those rights.

Plaintiff hereby requests a trial by jury in New Haven, Connecticut.

Dated this 11th day  of March 2013.

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, a/s/o ELI LILLY
AND COMPANY
By:  /s/Thomas L. Tisdale
THOMAS TISDALE, ESQ (ct06793)
TISDALE LAW OFFICES, LLC
10 SPRUCE STREET
SOUTHPORT, CT 06890
(203) 254-8474

-and-

ELISA TARA GILBERT, ESQ ( #EG5713 )
(pending pro hac vice)
THE GILBERT FIRM, P.C.
325 EAST 57TH STREET
NEW YORK, NY 10022
(212) 286-8524